INSURANCE COMPANY OF
NORTH AMERICA

v.

KAYSER–ROTH CORPORATION et al.

No. 99–531–Appeal.

Supreme Court of Rhode Island.

April 24, 2001.

Gregory Deschenes, Peter J. Barrett, Providence, Steven Adams, Jeffrey S. Brenner, Boston, MA, Thomas C. Angelone, for Plaintiff.

John Tarantino, Robert Karmen, Providence, Stacy P. Nakasian, Caroline S. Press, Marcus E. Cohn, Louis M. Solomon, New York, NY, Staci L. Sawyer, Vincent A. Indeglia, Anthony F. Muri, Providence, Paul R. Keopff, for Defendant.

Present WILLIAMS, C.J., and LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

Williams, Chief Justice.

This case came before us pursuant to the appeal of the defendant, First State Insurance Company (First State), from a judgment entered in the Superior Court in the amount of $9,118,955.61 in favor of another defendant, Kayser–Roth Corporation (Kayser–Roth). The trial justice determined that First State breached two insurance policies by failing to defend and indemnify Kayser–Roth against claims by the Environmental Protection Agency (EPA) relating to a Superfund cleanup site in Forestdale, Rhode Island. After hearing the arguments of counsel and examining the extensive memoranda that were submitted in this case, we affirm the judgment of the trial justice, except for the award of attorneys' fees.

### Facts and Procedural History

The facts of this case are largely undisputed. In 1969, a tanker truck delivering trichloroethylene (TCE), a cleaning solvent, caused a spill at a former textile mill in Forestdale, Rhode Island (Stamina Mills). The spill occurred when the hose of the tanker uncoupled during delivery of TCE to the plant, causing an unknown quantity of TCE to spill onto the ground and into the Branch River. Neither Stamina Mills nor any of its employees was at fault in connection with the spill. At the time, no attempt was made to clean up the spill; rather, the TCE was left to soak into the ground. The TCE ultimately infiltrated the groundwater and polluted the surrounding environment.

At the time of the spill, Stamina Mills was owned by Stamina Mills, Inc., a second-tier subsidiary of Kayser–Roth. Stamina Mills ceased operations in Forestdale in 1975, and the property was sold in 1976. Stamina Mills, Inc. was dissolved in 1977.

In September 1984, the EPA sent Kayser–Roth a letter advising that it was a "potentially responsible party" (PRP) with respect to the Stamina Mills site. In that letter, the EPA informed Kayser–Roth that if Kayser–Roth did not engage in certain remedial or response measures, then the EPA would do so and hold Kayser–Roth responsible for the costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), enacted in 1980. Kayser–Roth disagreed that it could be held liable for the cleanup of a site formerly owned by a subsidiary that had been dissolved pursuant to Rhode Island law. Nevertheless, Kayser–Roth notified First State and numerous other insurance carriers that the EPA claim relating to Stamina Mills was "likely to reach [them]." All of the insurance carriers refused to defend or indemnify Kayser–Roth.

In 1988, the EPA brought suit in federal court against Kayser–Roth under CERCLA. In January 1990, the federal court entered a judgment of $958,420.09 against Kayser–Roth for past costs incurred by the government; this amount included interest. The judgment further made Kayser–Roth "liable [to the United States] for response costs related to future on-site and off-site cleanup [of the Stamina Mills site]."[1] Unsuccessful efforts to appeal followed.

Thereafter, in 1992, the Insurance Company of North America (INA) filed this declaratory judgment action in the Superior Court against Kayser–Roth and approximately thirty other insurance carriers who had insured Kayser–Roth over a sixteen-year period. In total, more than eighty-five different insurance policies were involved in the coverage action. Numerous cross-claims and counterclaims were filed. Among other things, Kayser–Roth asserted claims for declaratory and monetary relief against each of the carriers. Specifically, Kayser–Roth sought a declaration that the carriers had breached their obligations to Kayser–Roth by failing to provide it with a defense or indemnity with respect to the Stamina Mills claim. Kayser–Roth sought damages for those breaches, as well as punitive damages for the carriers' bad faith denial of coverage.

Over the course of several years, the trial justice conducted numerous pretrial conferences and issued numerous orders in

---

1. Kayser–Roth is in the process of cleaning up the property and contaminated groundwater in Forestdale. The cleanup is proceeding in accordance with determinations and findings made by the EPA. The cleanup process is expected to take more than thirty years to complete.

an attempt to understand and delimit the different positions of the various parties, and to simplify the case for trial as much as possible. With the approval of all parties, the trial justice also participated in numerous settlement conferences. Ultimately, all the carriers settled, except First State.

A thirteen-day trial was held on the issues relating to First State and Kayser–Roth in March and April 1996. On July 29, 1999, the trial justice issued a written decision in which she rejected all of First State's defenses and ruled that the First State policies provided coverage for the environmental claim. Based on the evidence presented at trial, the trial justice found that the damage to the Stamina Mills property and the groundwater had manifested itself and had been discovered by 1969, that off-site damage to neighboring wells had manifested itself by 1979, and that, by early 1981, Kayser–Roth officials had sufficient information to cause a reasonable person to investigate and to discover that TCE from the site had migrated through the groundwater and contaminated the local water supply. The trial justice also found that by 1979, Kayser–Roth officials knew or should have expected that Kayser–Roth or a related entity was at risk of being sued by neighboring property owners for the harm allegedly caused to those properties because the local water supply had been contaminated.

However, the trial justice found that Kayser–Roth did not recognize, on the earlier dates, the specific peril at issue in this case—the judgment for economic losses associated with the EPA-ordered environmental cleanup. The trial justice stated: "To be sure, they recognized and understood * * * that the spill was a noteworthy event, that it was a cause for concern, and that it could yield potential consequences, including the risk of liability to

identifiable neighboring property owners." However, the trial justice was "not persuaded that Kayser–Roth * * * officials realized they risked liability or potential liability for remediation of the general environmental impairment related to this site prior to September 1984 when the letter identifying Kayser–Roth as a 'Potentially Responsible Party' was served by the EPA." Ultimately, the trial justice concluded that First State was liable to Kayser–Roth under two separate insurance policies for losses incurred as a result of the 1969 Stamina Mills spill, and that First State had breached its insurance contracts with Kayser–Roth by failing to defend Kayser–Roth in the federal court action. The trial justice awarded Kayser–Roth $9,118,955.61. First State appealed.

First State raises eight issues on appeal. Those issues will be discussed in the order that they were presented to us. Additional facts will be supplied as needed.

## I

### Standard of Review

■ "In accordance with our well-settled standard of review, '[t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *General Accident Insurance Co. of America v. American National Fireproofing, Inc.*, 716 A.2d 751, 755 (R.I.1998) (quoting *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 207 (R.I. 1997)).

## II

### Did the Trial Justice Err in Concluding that First State had Waived its Right to a Jury Trial?

■ First State's first argument on appeal is that the trial justice erred in con-

cluding that First State had waived its right to a jury trial. First State argues that although it never demanded a jury trial in any of its pleadings (and, therefore, waived a jury trial in its own right), it was entitled to rely upon the jury demands made by the other parties, to the extent of the issues embraced by those demands. First State argues that the issues embraced by the demands of the other carriers were broad and that First State, therefore, was entitled to a jury trial on virtually every issue in the case. Finally, First State argues that once demanded by any party, the right to a jury trial cannot be waived, except in limited circumstances. Kayser–Roth, on the other hand, argues that the trial justice did not err in denying First State a trial by jury. Alternatively, Kayser–Roth argues that even if the trial justice did err, such error was harmless and does not warrant a new trial.

On October 31, 1995, more than three years after INA filed the initial complaint and approximately three months before trial was set to begin, First State moved to file an answer to INA's first amended complaint and to amend its cross-claim against Kayser–Roth so it would include a jury demand. The trial justice denied that motion. The trial justice concluded that First State had waived its right to a trial by jury because it had not made a demand for a jury trial in accordance with the requirements of Rule 38 of the Superior Court Rules of Civil Procedure. The trial justice held that because of the complexity of the case and because of the fact that First State had not yet identified the issues that it wished to have tried before the jury, First State's request for a jury trial was not timely made. Furthermore, the trial justice noted that many of the issues in the case were particular to each carrier and that, therefore, First State had insufficient interest to warrant its reliance on the other carriers' jury demands. Finally, the trial justice concluded that First State's motion to amend was governed by Super.R.Civ.P. 39(b)'s discretionary standard and that it would be an abuse of discretion to order an otherwise waived jury trial in the absence of a showing of anything akin to excusable neglect. Accordingly, she denied First State's motion.

Rule 57 of the Superior Court Rules of Civil Procedure provides that the right to a trial by jury in a declaratory judgment action "shall be in accordance" with the rules of civil procedure and that the right "may be demanded under the circumstances and in the manner provided" for by Rules 38 and 39. Rule 38(b)(1) requires that a party demanding a jury trial serve a written demand upon the other parties within ten days after service of the last pleading directed to the issue for which a jury trial is sought. Pursuant to Rule 38(d), "[t]he failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of [a] trial by jury."

■ The trial justice did not err in concluding that First State had waived its right to a jury trial. First State did not demand a jury trial in accordance with the requirements of Rule 38 and it failed to show anything akin to excusable neglect for its failure to do so. First State waited until the eve of trial before it amended its answer to include a demand for a jury trial. First State was not entitled to rely, and indeed did not rely, on the jury trial demands made by the other parties in this case. It is well settled that "[w]here one party has made a demand [for a jury trial], others are entitled to rely on the demand with respect to issues covered by the demand and need not make an independent demand of their own." *In re N–500L Cases,* 691 F.2d 15, 22 (1st Cir.1982).

However, it is important to note that a party is entitled to rely upon the jury demand òf another party only to the extent of the issues covered by that demand. *See id.* at 24. "If the first demand does not cover issues pertinent to a second party, the second party cannot rely *reasonably* on the first demand, and the second demand would be far from superfluous since, without it, the right to a jury trial will have been waived as to those additional issues." *Id.* (quoting *Rosen v. Dick,* 639 F.2d 82, 92 (2d Cir.1980)).

The instant case involved more than twenty parties and more than 85 different insurance policies. Many of the issues involved were particular to each carrier. Indeed, the First State policies at issue were unlike any other policies involved in the case. For example, the 1982 First State policy did not require property damage to take place during the policy period, and the 1983–85 First State policy contained a broad "occurrence" definition that provided "claims-made" coverage in addition to coverage for property damage during the policy period. No other policy in question contained similar provisions. Accordingly, First State could not rely upon the jury demands of the other insurance carriers.

Furthermore, a review of the record reveals that First State did not rely on the jury demands of the other parties. The original complaint in this case was filed by INA on September 2, 1992. First State answered that complaint on October 16, 1992. At that time, none of the parties, including First State, had demanded a jury trial. On November 23, 1992, First State filed a cross-claim against Kayser–Roth. First State did not demand a jury trial at that time. It was not until October 1995 that First State moved to amend its answer and cross-claim so it would include a demand for a jury trial. As the trial jus-

tice correctly noted, "[i]n the context of this case, a request for a jury trial made just several months before trial was not timely made in any event."

Finally, we fail to see what questions of fact remained to be decided by a jury in light of the stipulation filed by the parties and the findings made by the trial justice. Those issues that First State would have submitted to the jury were either undisputed or decided in First State's favor. For example, First State would have asked the jury to determine whether Kayser–Roth was aware of groundwater contamination both on- and off-site by at least 1981, in an attempt to establish First State's known loss defense. As to those issues, the trial justice determined that Kayser–Roth was aware of on-site groundwater contamination by the end of 1969 and off-site groundwater contamination by the end of 1979. Both those dates are considerably before 1981.

Accordingly, it is our opinion that the trial justice did not err in denying First State a trial by jury. Because we find that the trial justice did not err in denying First State a trial by jury, we need not consider Kayser–Roth's harmless error analysis.

## III

### Did the Trial Justice Abuse her Discretion by Entering an Overly Broad Preclusion Order Against First State for Alleged Discovery Misconduct?

First State's second issue on appeal is that the trial justice abused her discretion by entering a preclusion order that was draconian, overly broad, and punitive in nature. First State argues that the preclusion order amounted to an abuse of discretion for three reasons: (1) because First State did not commit an "egregious"

discovery violation; (2) because Kayser–Roth was not materially prejudiced by First State's conduct; and (3) because the preclusion order went beyond what was necessary to remedy First State's conduct.

Throughout the extensive pretrial proceedings in this case, First State asserted a number of defenses to coverage and limitations on liability arising out of non-First State insurance policies that purportedly afforded coverage for the 1969 spill. Among other things, First State contended that there were numerous insurance policies issued by other carriers to which First State's policies were excess; that First State's policies and the policies to which they were excess contained various conditions, exclusions, definitions, and other terms the application of which would limit or defeat coverage; that First State was entitled to a setoff from those other insurance policies; that Kayser–Roth's liability to the EPA for cleanup costs should be allocated among the policies affording coverage for that damage; and that First State was liable to pay only its pro rata share of the amounts covered by it and the other carriers' insurance policies. Two of Kayser–Roth's interrogatories specifically addressed those contentions:

"5. State whether you contend that insurance coverage exists, under any insurance policy or policies issued by or on behalf of any insurance carrier other than yourself, with respect to all or any part of the claimed amounts.

"6. If your answer to Interrogatory No. 5 is affirmative, identify each insurance policy or policies providing such coverage."

First State's initial response was to object to those interrogatories because they "[sought] information regarding policies other than the FIRST STATE POLICIES." Thereafter, in May 1994, First State supplemented its response to those interrogatories by stating that it was:

"presently unable to advise Kayser–Roth whether any of the policies issued by other carriers named in this litigation would respond to the * * * claim since First State has not yet reviewed the terms and conditions of those policies and discovery is still in a preliminary stage. Nevertheless, First State further responds that some or all of the other carriers may be able to rely on all [*sic*] some or all of the defenses to coverage set forth in First State's Supplemental Response No. '1.'"

First State repeated substantially the same response when it supplemented its interrogatory answers in October 1995. Thus, for approximately three years, First State gave no indication that it seriously intended to pursue its "other insurance" defense. However, as trial neared and as other carriers settled, First State began to place great reliance on its "other insurance" defense.

At a pretrial conference on January 31, 1996, Kayser–Roth raised a concern about the inadequacy of First State's interrogatory responses, especially given First State's new emphasis on its "other insurance" defense. The trial justice directed First State to submit further responses to the interrogatories. Thereafter, First State filed its third set of supplemental responses to Kayser–Roth's first set of interrogatories in which it stated that "all of Kayser–Roth's comprehensive general liability * * * coverage in effect from January 1, 1969 to December 31, 1984 is applicable to the Stamina Mills site claim." First State did not mention, however, any of the defenses to coverage that it had referenced in its earlier responses.

Accordingly, Kayser–Roth moved to compel First State to provide further responses to its interrogatories. The trial

justice granted that motion, finding that First State equivocated when it used the word "applicable." The trial justice ordered First State to identify the specific policies that it asserted were not only applicable to the loss, but which also were not subject to any defenses to coverage. The trial justice made it clear that she would consider sanctions in the form of an order precluding First State from introducing evidence on the issue of other insurance if First State failed to comply with the order.

First State's amended third set of supplemental responses, which was filed pursuant to the court's order, contained a response similar to that given in its third set of supplemental responses. Thereafter, on February 26, 1996, Kayser–Roth moved for a preclusion order. A hearing was held on February 27, 1996. At that hearing, the trial justice again warned First State of the serious consequences of noncompliance and she gave First State one last chance to comply by either supplementing its pretrial memorandum or further responding to interrogatories five and six. First State did neither.

On February 28, 1996, the trial justice granted Kayser–Roth's preclusion motion. The trial justice noted that First State's "responses and conduct make it evident that First State [was] avoiding providing [the requested information] and [that it was] doing so deliberately" to protect its legal position in another lawsuit. The trial justice found that First State's failure to respond materially interfered with Kayser–Roth's ability to prepare for trial and the court's ability to simplify the issues for trial. Accordingly, the trial justice entered an order precluding First State:

"from presenting or producing evidence at trial in any form relating to the existence of coverage for the EPA claim at issue under any other policy or contract

of insurance or indemnification[;] * * * from advancing any contention or making any argument in any form relating to the existence of coverage for the EPA claim under any other policy or contract of insurance or indemnification in which argument or contention derived in any manner from the trial evidence[;] * * * [and] from presenting or producing evidence and from advancing or making any contention or argument in any other proceeding whether before this Court or in some other forum from which it would derive any benefit from setoff, pro rata allocation, or reduction in judgment amount with respect to the EPA claim at issue."

▮ "Our standard of review for evaluating sanctions for Rule 37 violations is abuse of discretion." *Senn v. Surgidev Corp.*, 641 A.2d 1311, 1320 (R.I.1994). "This [C]ourt is not likely to reverse on the basis of abuse of discretion when a rule provides for alternative sanctions and the trial justice selects the sanction that he or she deems the most appropriate for the particular case." *Id.* at 1319.

Rule 37 provides that the court may impose sanctions if a party fails to answer interrogatories or to comply with an order compelling it to do so. The available sanctions include, but are not limited to: dismissal, default, striking certain defenses, and precluding a party from producing evidence. *See* Rule 37(b). In *Senn*, we noted other cases in which we have upheld sanctions for Rule 37 violations because of a party's repeated failure and persistent refusal to respond properly to an opposing party's interrogatories in defiance of court orders. *See Senn*, 641 A.2d at 1318–19; *see also Bosler v. Sugarman*, 440 A.2d 129, 132 (R.I.1982) (no abuse of discretion under Rule 37 in a trial justice's refusal to remove a default judgment in a case involving "the persistent refusal of defen-

dant to make discovery in defiance of court orders"); *Providence Gas Co. v. Biltmore Hotel Operating Co.*, 119 R.I. 108, 113, 376 A.2d 334, 336–37 (1977) (no abuse of discretion in Superior Court's refusal to vacate a default judgment that had been entered for a defendant's failure to respond properly to the plaintiff's interrogatories); *Hodge v. Osteopathic General Hospital of Rhode Island*, 105 R.I. 3, 10–11, 249 A.2d 81, 85 (1969) (upholding Superior Court's dismissal of the plaintiff's case for his failure to file more responsive answers to interrogatories as ordered by the court).

The trial justice did not err by entering the preclusion order in the instant case. The trial justice's order was appropriate under the circumstances in light of First State's conduct throughout the pretrial period. First State was given ample opportunity to respond to Kayser–Roth's interrogatories and the trial justice repeatedly warned First State of the importance of the information and the consequences of not responding. First State, however, repeatedly refused to provide the requested information. The trial justice noted that "this preclusion order [was] the least harsh it could craft considering the consequences to Kayser–Roth of First State's failings." The preclusion order was tailored to preclude First State from introducing only the evidence that it repeatedly had refused to provide to opposing counsel so that opposing counsel could properly prepare for trial. Furthermore, the preclusion order did not prevent First State "from making a purely legal argument, in the context of this litigation, that it should be entitled to setoff, allocation, or reduction in judgment amount because of other carrier's liability to pay a particular amount of damages." Accordingly, the trial justice's sanction was appropriate.

## IV

## Is First State Entitled to a Setoff or Other Allocation Credit for Settlement Payments Received from Other Insurance Carriers?

First State's third issue on appeal is that it is entitled to a setoff or other allocation credit for settlement payments received from other insurance carriers. First State also argues that the trial justice erred in granting Kayser–Roth's motion to quash the subpoena calling for the production of the settlement agreements.

Before trial, the trial justice encouraged the parties to undertake meaningful settlement discussions. With the permission of the parties, the trial justice met separately with counsel and their respective client-principals in an effort to define the impediments to settlement and to facilitate communications. Initially, the carriers negotiated as a united front and each committed a specific amount of money to a settlement pool. However, the trial justice found that "the unified front's unity proved fragile and it strained under the weight of the carriers' bickering over which had more risk of liability." Thereafter, the trial justice encouraged the parties to undertake separate discussions, one on one, and suggested that each properly regard its exposure to liability and the risks of litigation. The parties agreed. They also agreed that the substance of the settlement discussions would remain private and would be treated as confidential by all, including the court.

At the court's direction, the parties participated in settlement conferences with the court and, also at the court's direction, their negotiating teams came to the settlement conferences with full authority to settle. First State, however, did not come to the initial settlement conferences with the requisite authority. First State came to follow-up conferences with more authority to settle, but never with full authority

to settle. In that regard, the trial justice found that "First State's strategy was quite openly that of waiting out the settlement process until it could better assess how much Kayser–Roth might reap from other negotiations." After months of settlement discussions, all the carriers except First State settled.

First State then subpoenaed the settlement documents at trial. First State argued that it was entitled to reduce the judgment against it to account for Kayser–Roth's settlements with other carriers. The trial justice, after reviewing the settlement documents *in camera,* disagreed and granted Kayser–Roth's motion to quash the subpoena. The trial justice found that the documents had no probative value because the settlements were so generalized that the court could not discern how the parties came to the settlement amounts or whether they intended to allocate any particular dollar paid in settlement toward the EPA loss or any specific policy of insurance. The trial justice also found that, given the preclusion order entered against First State, the documents would have been inadmissible to show that other insurance existed to which First State's liability was excess or for the purpose of allocating First State's pro rata share of the damages. Finally, the trial justice found that "although public policy mitigates against Kayser–Roth receiving a windfall, public policy mitigates more strongly against First State receiving a windfall." Among other things, the trial justice concluded that "allowing insurance carriers to place themselves excess to settlements with carriers providing concurrent insurance would discourage settlements—the carriers would simply attempt to wait each other out in the hope that the claim is paid from the settlements before their own insurance fund can be reached." Furthermore, to allow a setoff in the instant case would reward "a party which is guilty of a breach

of contract and which has failed to establish at trial the extent to which it has a legitimate contractual right to a setoff."

The trial justice did not err in quashing First State's subpoena for the settlement documents, and properly ruled that First State was not entitled to a further credit. It is important to note that the trial justice gave First State credit for $1,000,000 and $1,497,121, representing the underlying limits of the 1982 Aetna primary policy and payments Aetna made to Kayser–Roth under the 1984 "claims-made" policy for the EPA claim, respectively. First State was not entitled to a further setoff.

This issue is one of first impression in Rhode Island. Other jurisdictions have held that non-settling insurers are entitled either to a setoff of settlement amounts received by the insured or to a proportional credit for those shares that would have been allocated to the settling insurers. *See, e.g., Koppers Co. v. Aetna Casualty & Surety Co.,* 98 F.3d 1440 (3rd Cir.1996). In *Koppers,* the insured, Koppers Company, Inc. (Koppers), brought a breach of contract claim and a declaratory judgment claim against its liability insurers who had denied coverage for various environmental property damage claims. *See id.* at 1443. Koppers entered into settlements with several of its insurers before trial, leaving only certain excess liability insurers as defendants at trial. *See id.* After the trial was held, a jury found in favor of Koppers on liability and awarded Koppers approximately $70 million in damages. *See id.* The District Court entered judgment for Koppers, holding its excess insurers jointly and severally liable for the full amount of the claim without reducing the verdict to account for Koppers' settlements with the other insurers. *See id.*

On appeal, the Third Circuit reversed and remanded the case. *See Koppers Co.,*

98 F.3d at 1456. In reaching its conclusion, the Third Circuit looked to a case in which the Pennsylvania Supreme Court had held that when multiple primary insurance policies cover an indivisible loss, those insurers would be jointly and severally liable for the loss; the Third Circuit, therefore, predicted that the Pennsylvania Supreme Court would hold that a non-settling insurer would be entitled to reduce the judgment to account for a settling insurer's apportioned shares of liability. *See id.* at 1451–52. Recognizing that the case before it was more complicated in that it involved both primary and excess insurance carriers, the Third Circuit nevertheless extended the rule and held that "non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, 'exhausted' primary policies, and (2) the combined pro rata shares of other settling (primary and excess) insurers." *Id.* at 1455.

The rule applied in *Koppers* appears to be based upon two different principles: contract principles and equitable principles. In *Koppers* and the case upon which its determination relies, each insurer specifically " 'obligated itself to "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury [or property damage]." ' " 98 F.3d at 1450. Furthermore, the court recognized that the equitable principle of indemnity is founded upon "a fundamental principle of insurance law which prohibits insurance contracts from conferring a benefit greater than the insured's loss." *Id.* at 1452.

Applying contract and equitable principles in the instant case leads us to conclude that the trial justice did not err in regard to this issue. Although a setoff may be applied in an appropriate case, this is not such a case. First, as the trial justice correctly noted, First State had been precluded by its conduct from introducing any evidence at trial that other insurance existed to cover Kayser–Roth's losses as a result of the Stamina Mills spill. Therefore, First State could not carry its burden of proof in enforcing its rights concerning the existence of Kayser–Roth's other insurance. The settlement documents would not have been helpful to First State at trial; rather, a review of the applicable insurance policies was necessary. Furthermore, as the trial justice also correctly noted, "public policy [militates] * * * strongly against First State receiving a windfall [as a result of its conduct]." To allow First State a setoff beyond the credit given for the Aetna policies would have the effect of discouraging insurers from settling in the future and would reward First State for its conduct in the instant case. Accordingly, we reject First State's argument on this issue.

**V**

**Did the Trial Justice Apply an Incorrect Legal Standard for the Known Loss Doctrine by Requiring Proof that the Insured had Actual Knowledge of Liability Arising out of a Particular Loss?**

First State's fourth issue on appeal is that the trial justice erred in concluding that the known loss rule did not apply because Kayser–Roth did not have actual knowledge of the specific peril at issue in this case, that is, a judgment for the economic losses associated with the EPA-ordered environmental cleanup. First State argues that the correct standard was whether the insured knew *or should have known* of a substantial probability that *any* claim would be brought against it, not that a *particular* claim would be brought against it. First State argues that given

Kayser–Roth's extensive historical knowledge of the spill, it is beyond doubt that Kayser–Roth knew or should have known, before purchasing the First State policies, that there was a substantial probability of a loss as a result of the TCE contamination at the site, and that, therefore, judgment should have been entered in favor of First State on its known loss defense.

First State's argument must be rejected. As an initial matter, it must be noted that First State rested as to the 1982 policy before it had even put on any evidence in support of its defenses. Therefore, First State cannot now argue that its known loss defense precludes a finding of liability under that policy. Concerning the 1983–85 policy, the trial justice did not err in concluding that the known loss doctrine did not apply.

 Adding some confusion to the instant case is the fact that the distinction between the theories of known loss, known event, known risk, and loss in progress sometimes is blurred in case law. While at times the terms are used interchangeably, they are different doctrines and have different implications, depending upon the context in which they are applied. The known loss doctrine is applied when the insured has knowledge, before the inception of an insurance policy, that the insured has suffered the threat of an immediate economic loss, as a result of some event, and that the reality of that loss occurring is a certainty. *See generally* 3 Eric Mills Holmes, *Holmes's Appleman on Insurance 2d* § 16.4 at 290 (1998) (the known loss doctrine "applies only where the insured is aware of a threat of loss so immediate that it might be stated that the loss was already in progress and such was known at the time of application or issuance of the policy since this doctrine is designed to prevent fraud when coverage is sought to be misused to insure a certainty rather than a fortuity"). In the context of third-party insurance, such as is at issue in the instant case, the economic loss to the insured generally takes place at some point in time after the injurious event. *See Montrose Chemical Corp. of California v. Admiral Insurance Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 905 (1995) (en banc). That loss is insurable in certain situations: when "there is uncertainty about *the imposition of liability* and no 'legal obligation to pay' yet established, there is an insurable risk for which coverage may be sought * * *." *Id.* at 905–06.

In *City of Johnstown, New York v. Bankers Standard Insurance Co.*, 877 F.2d 1146, 1152–53 (2d Cir.1989), the Court of Appeals for the Second Circuit rejected the proposition that knowledge of a risk makes that risk uninsurable. The Second Circuit, applying New York law, noted that it was well-established that there can be no recovery (1) on property that the insured knew was already destroyed at the inception of the insurance, or (2) when the insured fraudulently concealed or misrepresented a material fact to the insurer at the time the policy was issued. *See id.* at 1153. To recognize a "known risk" theory "might well swallow up the more narrow doctrines regarding (1) concealment and misrepresentation, and (2) damages that are 'expected' or 'intended' by the insured." *Id.*

In the instant case, the 1983–85 First State policy incepted before Kayser–Roth received any indication that the government would seek to hold it liable for the costs of remediation under CERCLA. Nothing that occurred before the receipt of the PRP letter in 1984 gave Kayser–Roth any idea that it would be held liable for environmental cleanup on such a grand scale, or, for that matter, on any scale. As the trial justice noted, even the receipt of the PRP letter left substantial doubts

about Kayser–Roth's liability on the claim. Neither Kayser–Roth nor its subsidiary caused the spill in 1969. Furthermore, the Stamina Mills site never was owned by Kayser–Roth, but by a second-tier subsidiary that dissolved years before CERCLA was enacted in 1980. If not for the strict liability imposed under CERCLA, Kayser–Roth may never have been involved in the EPA action. Before the EPA action, the only claim ever brought against Kayser–Roth was brought by a single landowner seeking compensation for property damage. Kayser–Roth successfully defended that claim. Accordingly, although Kayser–Roth was aware that it potentially could be subjected to suits for property damage, it did not know, and had no reason to know, at least until 1984, that it could be subjected to a suit from the government for clean-up costs. Therefore, First State's known loss defense was properly denied.

## VI

**Did Kayser–Roth Prove, as Part of its Prima Facie Case, Coverage Under the Underlying 1984 Aetna "Claims Made" Policy in Order to Trigger Coverage Under the Environmental Impairment Liability (EIL) "Claims–Made" Section of the 1983–85 First State Policy?**

■ First State's fifth argument on appeal is that there was insufficient evidence to support the trial justice's finding that coverage existed under the Environmental Impairment Liability (EIL) "claims-made" section of the 1983–85 First State policy because Kayser–Roth did not attempt to prove coverage under the underlying 1984 Aetna "claims-made" policy and, therefore, failed to establish a prima facie case under the First State policy. Furthermore, First State argues that "Exclusion No. 5" in the 1984 Aetna "claims-made" policy, which excludes coverage for liability for environ-

mental impairment covered under the Aetna CGL policies, bars coverage under the First State policy.

First State's first argument concerning this issue is that Kayser–Roth failed to establish a prima facie case of coverage under the 1983–85 First State policy because Kayser–Roth did not prove that coverage existed under the underlying 1984 Aetna "claims-made" policy. At trial, First State argued that to make out a prima facie case to trigger coverage under its policy, Kayser–Roth would have to prove the validity of both the coverage and the payments afforded by the underlying Aetna policy. The trial justice disagreed. The trial justice concluded that Kayser–Roth did "not bear the burden of proving the validity of the claims, coverage, or payments which led to the exhaustion of the 1984 Aetna policy in order for coverage to be triggered under the language of the First State policy." The trial justice found that, absent fraud between the insured and the primary carrier, "the insured does not carry the burden of proving the soundness of the primary carrier's decision to pay[. * * * I]t is for the excess carrier to seek redress from the underlying carrier should the excess carrier believe that the underlying carrier has exposed it to liability or caused it harm by mishandling the claim in some respect." Furthermore, the trial justice concluded that the triggering event for the 1983–85 policy was plainly the exhaustion of the underlying limit and that since Kayser–Roth had proven such exhaustion, the burden was on First State to prove those matters that would limit or defeat coverage.

■ It is well settled that "the insured seeking to establish coverage bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy, the loss as within

the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy." *General Accident Insurance Co. of America v. American National Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I.1998). Once the insured makes a prima facie showing of coverage, "[t]he insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment * * *." *Id.* In the instant case, Kayser–Roth sought coverage under First State's policy. Accordingly, Kayser–Roth would have to prove that *First State's* policy provided coverage, not that payment under Aetna's policy was valid.

The 1983–85 policy provides that First State will pay Kayser–Roth's ultimate net loss in excess of the applicable underlying limit that Kayser–Roth becomes obligated to pay as money damages because of property damage to which the policy applies and which is caused by an occurrence. The policy defines "property damage" as any damage, including physical injury to or loss or destruction of tangible property. It is undisputed that the TCE contamination rendered the mill site, the local water supply, and the neighboring properties damaged by and in the years 1983 through 1985. The policy is, therefore, implicated as long as there has been an "occurrence."

The 1983–85 policy defines "occurrence" as:

"an accident or a happening or an event or a continuous or repeated exposure to conditions which is unexpected and unintended from the standpoint of the Named Insured during the policy period. An accident or a happening or an event or a continuous or repeated exposure to conditions which occurs prior to the policy period, and would be covered by underlying insurance policies and/or coverages written on a claims[-]made basis but for the reduction or exhaustion of

the aggregate limits of liability of such underlying policies and/or coverages, is deemed to be an Occurrence during the policy period."

The trial justice found that coverage was available pursuant to the second sentence of that definition. Pursuant to that sentence, Kayser–Roth had to show that events took place before the policy period and that those events would have been covered by the underlying policy but for the exhaustion of that policy. The policy language is clear and unambiguous, and Kayser–Roth satisfied its burden of proof concerning both elements. Kayser–Roth did not bear the burden of proving the validity of Aetna's payments under Aetna's claims-made policy. Accordingly, we reject First State's argument. We will not address First State's second argument on this issue because it is without merit. As discussed above, the provisions of the underlying Aetna policy, including Exclusion No. 5, are not relevant to a finding of liability under the First State policy. Furthermore, even if the provisions were relevant, First State would bear the burden of proving those matters that would limit or defeat coverage. First State failed to carry that burden in the instant case.

## VII

### Did Kayser–Roth Prove, as Part of its Prima Facie Case, Exhaustion Under the 1982 First State Policy?

First State's sixth issue on appeal is that Kayser–Roth failed to prove exhaustion of the policy underlying the 1982 First State policy and that, therefore, the First State policy never was properly triggered. First State argues that an excess insurer has no duty to indemnify or contribute to a settlement until after a primary insurer's policy limits have been exhausted. *See Liberty Mutual Insurance Co. v. Harbor Insurance Co.*, 603 A.2d 300, 303 (R.I.1992).

First State argues that Kayser–Roth failed to introduce the 1982 Aetna CGL primary policy and that it concededly made no attempt to prove exhaustion of that policy.

First State's reliance on *Liberty Mutual* is misplaced. The rule of law announced in Liberty Mutual was that *"[w]hen faced with conflicts * * * between an umbrella policy and an essentially primary policy made excess by a nonownership clause*, a majority of jurisdictions have adopted the rule that the umbrella policy need not contribute until after the primary coverage is exhausted." *Liberty Mutual*, 603 A.2d at 302 (citing *Allstate Insurance Co. v. Employers Liability Assurance Corp.*, 445 F.2d 1278 (5th Cir.1971)). (Emphasis added.) No such conflict has been alleged in the instant case.

■ "It is well settled under Rhode Island law that when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties [are] bound by them." *Amica Mutual Insurance Co. v. Streicker*, 583 A.2d 550, 551 (R.I.1990) (citing *Malo v. Aetna Casualty & Surety Co.*, 459 A.2d 954, 956 (R.I.1983)).

■ The 1982 First State policy provides that First State will pay Kayser–Roth's ultimate net loss in excess of the recoverable "underlying *limit*" which Kayser–Roth becomes obligated to pay as money damages because of property damage to which the policy applies and that is caused by an occurrence. (Emphasis added.) "Property damage" is defined as any damage, including physical injury to or loss or destruction of tangible property. As has been stated, there is no dispute that property damage has occurred in the instant case. Furthermore, unlike the language in the 1983–85 policy, the definition of "occurrence" in the instant policy does not require that property damage take

place during the policy period. Accordingly, the policy, by its terms, provides coverage. Kayser–Roth did not have to show that the underlying Aetna policy had been exhausted. In fact, the 1982 First State policy contained a "maintenance" provision that required the policyholder to maintain the schedule of underlying insurance, but explicitly provided that:

"Failure of the Named Insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured complied with this condition."

Pursuant to that provision, coverage existed under the policy regardless of the maintenance—or the related reduction or exhaustion—of the underlying insurance. Therefore, evidence of exhaustion would be irrelevant. Accordingly, we reject First State's argument on this issue.

### VIII

### Was the Trial Justice's Award of $5.4 Million in EPA Oversight Costs Premature and Erroneous?

■ First State's seventh argument on appeal is that the trial justice erred in awarding $5.4 million in EPA oversight costs. First State argues that the $5.4 million award was premature, based on speculation and conjecture, and, therefore, erroneous. First State argues that there was no evidence that Kayser–Roth had paid or was found legally obligated to pay that amount.

■ "Although a damages award 'may not properly be the result of speculation or conjecture,' * * * this Court will not disturb a trial justice's award unless it is grossly excessive." *Harris v. Town of Lincoln*, 668 A.2d 321, 328 (R.I.1995) (quoting *Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 314, 377 A.2d 237, 240–41 (1977)). The trial justice did not err in

entering the instant award; the award was not based on speculation or conjecture, nor was it grossly excessive. At trial, Kayser–Roth's damages expert, Phillip Coop (Coop), testified concerning the EPA oversight costs at issue. Coop testified that he had reviewed a draft EPA invoice and that there were no items on it that Kayser–Roth could challenge. He further testified that if there is no challenge, the EPA will issue a final invoice that must be paid within thirty days. Indeed, the record reflects that an amended administrative order was entered on June 4, 1991, that clearly required payment within thirty days.

There is no evidence that this award was grossly excessive, especially given the magnitude of the EPA cleanup efforts. Indeed, the trial justice noted that:

"First State has not offered any evidence that it has successfully defended Kayser–Roth against any portion of the EPA final costs report such that Kayser–Roth is not liable to the EPA in the full amount of the assessment. So, while First State may contend that the EPA charges are too high, are redundant, or that Kayser–Roth should attempt to mitigate its damages by contesting or negotiating the charges, First State has missed its opportunity to defend Kayser–Roth against the EPA and cannot now stand back and quibble with the job Kayser–Roth has done in defending itself."

Accordingly, we reject First State's argument with regard to this issue and affirm the trial justice's award of $5.4 million in EPA oversight costs.

## IX

### Did the Trial Justice Err by Awarding Kayser–Roth Attorneys' Fees and Costs?

First State's final issue on appeal is that the trial justice erred in awarding attorneys' fees and costs in the instant case. It is well settled that attorneys' fees may not be appropriately awarded to the prevailing party absent contractual or statutory authorization. *See, e.g.,* G.L.1956 § 9–1–33 (authorizing reasonable attorneys' fees upon showing that insurer refused to pay or settle claim in bad faith); § 9–1–45 (authorizing reasonable attorneys' fees to prevailing party when court finds complete absence of a justiciable issue of law or fact); *Bibeault v. Hanover Insurance Co.,* 417 A.2d 313, 319 (R.I.1980) ("in the absence of contractual or statutory authorization, such fees may not be awarded as a separate item of damages"). In the instant case, the issue of bad faith was severed from the other issues at trial and has not yet been adjudicated. Accordingly, the award of attorneys' fees should be vacated and the case should be remanded for further proceedings to determine (1) whether First State acted in bad faith, thereby entitling Kayser–Roth to attorneys' fees, pursuant to § 9–1–33; and (2) whether First State had a contractual duty to defend Kayser–Roth in the federal court action, *United States v. Kayser–Roth Corp.,* 724 F.Supp. 15 (D.R.I.1989), and, if so, whether Kayser–Roth is entitled to attorneys' fees for that action. However, the costs award is appropriate and shall be affirmed. *See* G.L.1956 § 9–22–5 ("[i]n civil actions at law, the party prevailing shall recover costs * * * in the discretion of the court").

### Conclusion

In conclusion, the appeal is denied in part and sustained in part. We affirm the judgment of the trial justice, except for the award of attorneys' fees. That award is vacated and the case is remanded to the Superior Court for further proceedings on that issue.

Justice FLANDERS did not participate.

Chief Justice WEISBERGER (Ret.) did not attend oral argument but participated on the basis of the briefs.