**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AXIS REINSURANCE COMPANY, a corporation,

*Plaintiff-Appellee*,

v.

NORTHROP GRUMMAN CORPORATION, a corporation,

*Defendant-Appellant.*

No. 19-55135

D.C. No. 2:17-cv-08660-AB-JC

OPINION

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted March 30, 2020
Pasadena, California

Filed September 14, 2020

Before: Richard A. Paez, Consuelo M. Callahan, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Callahan

# SUMMARY[*]

## Diversity/Insurance

The panel reversed the district court's summary judgment in favor of plaintiff, AXIS Reinsurance, and remanded, in AXIS's action seeking reimbursement of an insurance payment that it made, as a secondary excess insurer, to Northrop Grumman Corporation.

AXIS argued that Northrop's underlying insurers paid an uncovered claim arising from Northrop's settlement of alleged ERISA violations, thereby "improperly eroding" their policies' liability limits and prematurely triggering AXIS's excess coverage. The district court agreed and held that AXIS was entitled to seek reimbursement of the payment amount from Northrop against a later, valid claim.

The panel held that, consistent with the limited caselaw and secondary sources that have addressed excess insurer claims of "improper erosion," "improper exhaustion," "wrongful exhaustion," and similar challenges to the payment decisions of underlying insurers, an excess insurer may not challenge those decisions in order to argue that the underlying liability limits were not (or should not have been) exhausted absent a showing of fraud or bad faith, or the specific reservation of such a right in its contract with the insured.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that no reasonable insured in Northrop's position would understand that it might have to justify its underlying insurers' payment decisions as a prerequisite to obtaining excess coverage from AXIS. Therefore, consistent with the general rule favoring the objectively reasonable expectations of the insured, the panel reversed the district court's summary judgment order and remanded for further proceedings consistent with its opinion.

## COUNSEL

Kevin M. Fong (argued), Shaw Pittman LLP, San Francisco, California; Barry J. Fleishma, Shaw Pittman LLP, Washington, D.C.; for Defendant-Appellant.

Kim W. West (argued) and Alec H. Boyd, Clyde & Co. US LLP, San Francisco, California, for Plaintiff-Appellee.

## OPINION

CALLAHAN, Circuit Judge:

This case raises an issue of first impression in our circuit: when, if ever, may an excess insurer challenge an underlying insurer's payment decision as outside the scope of coverage? AXIS Reinsurance Company ("AXIS"), a secondary excess insurer to Northrop Grumman Corporation ("Northrop"), argues that underlying insurers paid an uncovered claim arising from Northrop's settlement of alleged ERISA violations, thereby "improperly eroding" their policies' liability limits and prematurely triggering AXIS's excess coverage. The district court agreed and held that AXIS was

entitled to seek reimbursement of the payment amount from Northrop against a later, valid claim. We find that no authority supports AXIS's theory of "improper erosion." Nor did AXIS clearly reserve its right to challenge the underlying insurers' coverage decision. Therefore, consistent with the general rule favoring the objectively reasonable expectations of the insured, we reverse.

I

Two separate lawsuits were brought against Northrop alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Northrop settled both lawsuits out of court, in each case referring its settlement payment to its insurers for coverage.

The first lawsuit was brought by the Department of Labor ("DOL") following a broad investigation into the administration of the Northrop Grumman Savings Plan ("Plan") and several related employee savings and pension plans. The DOL investigation resulted in assertions of wrongful activity by a number of Northrop-related entities and individuals. In December 2016, Northrop settled the alleged violations, consenting to pay certain amounts[1] to the Plan and to the DOL in exchange for a full release from further liability ("DOL Settlement"). Although Northrop agreed to the payments, it did not admit or deny the DOL's allegations. Because the parties settled out of court, there were no judicial findings or factual stipulations regarding the

---

[1] The specific settlement amounts are confidential and remain in the sealed portions of the record.

proportion of the settlement payments, if any, that constituted disgorgement.[2]

The second lawsuit was brought on behalf of the Plan and another Northrop savings program.  Northrop settled this second lawsuit in June 2017 for the sum of $16,750,000 ("*Grabek* Settlement").

At the time, Northrop carried a multi-layered program of Employee Benefit Plan Fiduciary Liability Insurance, including (1) a $15 million primary insurance policy with National Union Fire Insurance Company of Pittsburgh, PA ("National Union"); (2) a $15 million excess insurance policy with Continental Casualty Company ("CNA"); and (3) a $15 million secondary excess insurance policy with AXIS.  As the secondary excess insurer, AXIS was required to "drop down" to provide coverage only when the combined $30 million liability limit of the underlying insurance policies was exhausted for "covered loss" under those policies.

National Union determined that the DOL Settlement fell under its primary insurance policy, which covered loss resulting from actual or alleged wrongful acts by Northrop or its employees, including violations of ERISA. The policy defined "loss" to include damages, judgments, settlements, and defense costs, but not "matters which may be deemed uninsurable under [applicable state] law" or "civil or criminal fines or penalties imposed by law, except . . . the 20 percent or less penalty imposed upon an Insured under Section 502(1) of ERISA, with respect to covered

---

[2] "Disgorgement" refers to "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *Disgorgement*, Black's Law Dictionary (11th ed. 2019).

settlements or judgments."[3]  National Union paid a portion of the DOL Settlement amount, exhausting its $15 million liability limit.  CNA agreed that the DOL Settlement fell within the scope of coverage and dropped down to pay the remainder of the settlement amount.  Because CNA's partial payment did not fully exhaust its $15 million liability limit, AXIS was not required to cover any portion of the DOL Settlement.

Because the DOL Settlement exhausted National Union's primary coverage, CNA covered the subsequent *Grabek* Settlement as primary insurer.  CNA determined that this settlement, like the DOL Settlement, fell within its scope of coverage and it contributed $7,043,762.08 of the total settlement cost, exhausting the remainder of its $15 million liability limit.  AXIS was then called upon to pay the remainder of the settlement, $9,706,237.92.  AXIS did not contest the validity of the *Grabek* Settlement under the terms of its excess policy and covered its portion of the settlement.  However, it notified Northrop that it intended to seek reimbursement of the DOL Settlement amount on the ground that this earlier payment by National Union and CNA was "not for covered loss."  AXIS argued that the underlying insurers' improper payment of the DOL Settlement prematurely triggered AXIS's excess liability once the *Grabek* Settlement was filed.

---

[3] The National Union policy also excluded from coverage claims arising out of, based upon, or attributable to (1) the gaining of any profit or advantage without legal entitlement, or (2) the knowing or willful violation of any statute, rule, or law—including ERISA—but only in cases where, unlike here, the illegal profit or violation of law was established by a judgment, final adjudication, or a binding arbitration adverse to Northrop.

AXIS accordingly filed a complaint for declaratory relief and damages against Northrop, alleging that "the collective payment of [the DOL Settlement] by National Union and [CNA] . . . was not for covered loss and therefore resulted in improper erosion of the Limits of Liability of" the underlying policies, which "caus[ed] AXIS to 'drop down' by [the settlement amount,] . . . unjustly enriching Northrop by the same amount." Specifically, AXIS argued that the DOL Settlement payment constituted disgorgement, rendering it "uninsurable under [California] law" and, therefore, an "uncovered loss" under the terms of the primary and excess policies. The district court agreed and granted AXIS's motion for summary judgment. It held that, "[a]s a matter of law, AXIS's payment of . . . the DOL Settlement [amount] was not covered by its excess coverage policy" and therefore "AXIS is entitled to reimbursement of [the settlement amount] for its excess coverage."

Northrop timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II

We review de novo a district court's grant of summary judgment. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)). In making this determination, we view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *Id.*

III

We begin our analysis by noting that no circuit precedent adopts the "improper erosion" theory of recovery asserted by AXIS and relied upon by the district court in its summary judgment order. Under that theory, when an entity purchases multiple layers of insurance, the insured entity (in this case, Northrop) bears the risk that an excess insurer might disagree with payment decisions made by underlying insurers, and might withhold payment of valid claims it would otherwise cover to compensate itself for the exposure caused by those allegedly improper payments. Northrop argues that this theory is unsupported and wrong, and that AXIS, not Northrop, assumed the risk that Northrop's primary and first level excess insurers might adjust claims in a manner that would trigger AXIS's secondary excess coverage.

We agree with Northrop's perspective, which is consistent with the limited caselaw that has addressed this issue. Those decisions hold that excess insurers generally may not avoid or reduce their own liability by contesting payments made at prior levels of insurance, unless there is an indication that the payments were motivated by fraud or bad faith. Of course, excess insurers may contract around this general rule by including specific language in their policies reserving a right to challenge prior payments (so long as the provision is not prohibited by applicable law).[4]

---

[4] *Cf. AXIS Surplus Ins. Co. v. Innisfree Hotels, Inc.*, No. CIV.A. 05-0527-WS-C, 2006 WL 2882373, at *9 n.22 (S.D. Ala. Oct. 6, 2006) (noting that "the Axis Excess Policy . . . states that amounts paid by underlying insurance for losses that would not have been payable under the Axis Excess Policy *do not count* towards the $10 million" liability limit, and that, "[a]s a result, any amounts that the Primary Policy paid for flood losses *do not erode* the $10 million threshold, creating a

Here, however, there is no indication that Northrop and AXIS mutually agreed that the "covered loss" provision in the AXIS policy would have this effect.

## A

In adopting AXIS's theory of improper erosion and applying it to the DOL Settlement, the district court relied on *Shy v. Insurance Company of the State of Pennsylvania*, 528 F. App'x 752 (9th Cir. 2013). That unpublished decision affirmed a district court's grant of summary judgment to an excess insurer that denied coverage despite the primary insurer's payment of the claim up to its liability limit. *Id.* at 753–54. In *Shy*, however, a single claim was referred to two different insurers, who took differing views of whether the claim fell within the underlying policy's coverage provisions. *Id.* In that distinct scenario, we concluded that the excess insurer was "bound by the terms of [the primary] policy but not [the primary insurer's] coverage decision." *Id.* at 754; *accord Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 633 (2007). In other words, the excess insurer could challenge the portion of the single claim that the insured asked it to pay, despite the primary insurer's decision *not* to challenge its own portion of the claim.

The facts of this case are closer to those at issue in a recent district court case, *Costco Wholesale Corp. v. Arrowood Indem. Co.*, 387 F. Supp. 3d 1165 (W.D. Wash. 2019) ("*Costco*"). There, a third layer excess insurer argued that "its policy should never have been triggered because the underlying insurers should have refused to pay some or all

possibility of a gap in coverage between layers for which [the insured] itself would be responsible" (emphasis added)).

of the invoices submitted to them" in relation to an $8 million class action settlement between Costco and its employees with over $30 million in attorney's fees and costs. *Id.* at 1173. The excess insurer argued that its excess policy, which contained similar language to the "covered loss" provision in the AXIS policy,[5] required Costco to defend the underlying insurers' coverage decisions. *Id.* at 1173–74. In essence, the insurer argued that "each excess insurer in an insurance tower can force the insured to prove that every payment made by the underlying insurers fit the definition of 'Loss,' that no exceptions or limitations on coverage were overlooked, and generally that there had been no overpayments at the lower levels of coverage." *Id.* at 1174.

The *Costco* court rejected this argument, observing that an excess insurer generally "may not . . . second-guess the coverage determinations of the underlying insurers" absent a "contractual right to interfere in their adjustment processes." *Id.* at 1173. Instead, while an excess insurer is not bound by the underlying insurers' policy interpretations,

> the weight of authority holds that an excess insurer may not challenge the underlying insurers' payment decisions in order to argue that their policy limits were not (or should not have been) exhausted . . . unless there is an indication that the payments were motivated by fraud or bad faith.

---

[5] The policy provided that Costco's third layer excess insurer would drop down to provide coverage "only in the event of the reduction or exhaustion of the Underlying [$35 million] Limit by reasons of the insurers of the Underlying Policies paying in legal currency Loss." 387 F. Supp. 3d at 1174.

*Id.* at 1173–74 (citations omitted).  The *Costco* court went on to note that the policy provision at issue was "ambiguous in the context presented . . . and in light of other policy language," and that it therefore "must be construed against the insurer and in favor of the insured" under applicable state law.  *Id.* at 1174 (citing *Holden v. Farmers Ins. Co. of Wash.*, 169 Wash. 2d 750, 756 (2010)).

We adopt the general rule set out in *Costco*, which the weight of authority clearly supports.**[6]**   We agree with

---

**[6]** *See* Allan D. Windt, *Insurance Claims and Disputes*, § 6:45A (6th ed. 2018) ("[A]t least absent fraud/bad faith, an excess insurer is bound by the fact that the primary insurer has paid, and cannot contest (a) that such payment reduces the primary insurer's applicable aggregate, or (b) that the excess insurer must provide policy benefits when the aggregate in any relevant primary policy has been exhausted."); *Edward E. Gillen Co. v. Ins. Co. of the State of Pa.*, No. 10-C-564, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) (holding that an excess liability insurer "is free . . . to contest coverage under its own policy [but] cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance"); *ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*, A-07-CA-718-SS, 2008 WL 5973220, at *5–7 (W.D. Tex. Aug. 25, 2008) (rejecting excess insurer's argument that the underlying policy limits had not been exhausted because the underlying insurers had made payments outside the scope of coverage, had failed to apply exceptions to coverage, or had otherwise overpaid); *Ins. Co. of N. Am. v. Kayser-Roth Corp.*, 770 A.2d 403, 416-17 (R.I. 2001) ("[A]bsent fraud between the insured and the primary carrier, 'the insured does not carry the burden of proving the soundness of the primary carrier's decision to pay . . . [I]t is for the excess carrier to seek redress from the underlying carrier should the excess carrier believe that the underlying carrier has exposed it to liability or caused it harm by mishandling the claim in some respect."); *UNR Indus., Inc. v. Cont'l Ins. Co.*, No. 83 A 2523, 1988 WL 121574, at *16–17 (N.D. Ill. Nov. 9, 1988), *amended*, No. 85 C 3532, 1989 WL 265493 (N.D. Ill. Jan. 11, 1989) (rejecting excess insurer's unsupported theory that it could "proceed against its insured because of the primary insurer's alleged 'improper exhaustion' of primary coverage or

Northrop that the district court's alternative rule—that excess insurers generally may contest the soundness of underlying insurers' payment decisions—"would undermine the confidence of both insureds and insurers in the dependability of settlements," eliminating one of the primary incentives for obtaining insurance in the first place. Furthermore, such a rule would introduce a host of inefficiencies into the insurance industry, with no obvious countervailing benefits to insurers or policyholders.

The district court was concerned that adoption of the *Costco* rule "would render the terms of excess insurer policies useless," because "[w]ere AXIS required to pay, without any opportunity to dispute the validity of its payment, any excess insurer could be liable to cover payments totally outside the scope of its excess coverage policy." We do not share the district court's concern, which ignores that AXIS never disputed the validity of the claim that Northrop asked it to cover—the *Grabek* Settlement. Instead, AXIS sought to reduce its liability for that concededly valid claim by disputing the validity of a different claim, the DOL Settlement, which it was never asked to cover. Under the *Costco* approach, which we adopt, an excess insurer remains free to contest claims submitted to it during the claims adjustment process, even when an underlying insurer has already determined that the same claim falls within the scope of coverage. But, absent a specific contractual provision, it may not second-guess other

'negligent handling' of a defense" where the excess insurer "alleged no bad faith conduct by" the primary insurer); *see also Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 275 (5th Cir. 2015) (expressing skepticism about, although not reaching, an excess insurer's "wrongful exhaustion" claim against an underlying insurer, where the excess insurer was arguing on behalf of a common insured).

insurers' payments of earlier claims without first showing that those payments were motivated by fraud or bad faith.

The district court's perspective presumes that underlying insurers are motivated to pay uncovered claims even in the absence of fraud or bad faith.  While such a possibility may exist, we do not think that there are many instances where an insurance company will pay out claims—let alone its policy's limit—when it is not obligated to do so (at least in cases not involving fraud or bad faith).  But even if AXIS were correct that insurers sometimes choose to settle claims that fall outside their scope of coverage "for what they perceive[] as legitimate business reasons," nothing prevents AXIS or any other excess insurer from raising and leveraging this concern during contractual negotiations with their policyholders.  For example, the excess insurer could request higher premiums to account for this contingency, or it could insert specific policy language reserving its right to contest "improper erosion" by the underlying insurers under certain conditions—so long as the provision does not conflict with applicable law or public policy.**[7]**

Therefore, consistent with the limited caselaw and secondary sources that have addressed excess insurer claims of "improper erosion," "improper exhaustion," "wrongful exhaustion," and similar challenges to the payment decisions of underlying insurers, we hold that an excess insurer may not challenge those decisions in order to argue that the underlying liability limits were not (or should not have been)

---

**[7]** We note that Northrop argued only that the inclusion of "improper erosion" clauses in excess policies would be impractical and unwise, not that they would be per se illegal.  Neither party has pointed to any public policy or provision of the California Insurance Code prohibiting such clauses as a matter of law, nor are we aware of any.

exhausted absent a showing of fraud or bad faith, or the specific reservation of such a right in its contract with the insured.

B

Here, AXIS has not alleged fraud or bad faith.  Thus, the only question is whether the terms of its excess policy with Northrop entitled it to assert improper erosion—that is, to challenge the soundness of National Union's and CNA's decision to cover the DOL Settlement and to demand reimbursement from Northrop of the settlement amount against a later, unrelated claim.

To answer this question, we look to California law, which both parties agree applies here.  Under California law, interpretation of an insurance policy is a question of law, subject to the ordinary rules of contractual interpretation. *See Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995); *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818 (1990).  Policy language must be interpreted "in context, with regard to its intended function in the policy," keeping in mind that "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the West*, 2 Cal. 4th at 1264–65 (citing Cal. Civ. Code § 1636).  "If contractual language is clear and explicit, it governs." *Id.* at 1264 (citing Cal. Civ. Code § 1638).  If there is ambiguity, however, it is generally resolved against the insurer and in favor of coverage. *Id.*; *see AIU Ins.*, 51 Cal. 3d at 822 ("[W]e generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured.").  A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable. *Waller*, 11 Cal. 4th at 18.

The AXIS policy requires, as a prerequisite to excess coverage, exhaustion of the underlying insurance liability limits "for covered loss" under those policies. But the policy contains no language expressly providing AXIS with the right to challenge the propriety of the underlying insurers' payment decisions under this provision. It does not state that AXIS may challenge those prior payments on grounds of "improper erosion" or "improper exhaustion," or that AXIS may seek reimbursement of those payments against unrelated, valid claims by asserting that the prior payments were for "uncovered loss." As AXIS conceded at oral argument, the "covered loss" provision "is silent on the ability to challenge," and AXIS has pointed to no other policy provision as a basis for its purported right to seek reimbursement of the prior payment on grounds of "improper erosion."

In short, the AXIS excess policy does not clearly and unambiguously reserve for AXIS a right to challenge National Union's and CNA's payment of the DOL Settlement. Because the policy language as a whole indicates that Northrop and AXIS did not mutually intend for AXIS to have the right to second-guess the coverage decisions of underlying insurers, we resolve whatever ambiguity exists in the policy against the insurer, AXIS, and in favor of Northrop's objectively reasonable expectations of coverage. *See Bank of the West*, 2 Cal. 4th at 1264–65; *AIU Ins.*, 51 Cal. 3d at 822.

## C

Because we hold that there is no general rule supporting AXIS's claim of improper erosion and AXIS did not contractually reserve its right to assert this claim, we do not reach the question of whether the DOL Settlement violated California's public policy against paying insurance benefits

to compensate an insured for disgorgement. *See Bank of the West*, 2 Cal. 4th at 1266, 1269. We do note, however, that the statute that barred insurance coverage for disgorgement in *Bank of the West*, California Insurance Code § 533.5, applies only to civil actions brought by the state attorney general, a district attorney, or a city prosecutor—not to actions, like the DOL lawsuit, brought by the federal government. *See Bodell v. Walbrook Ins. Co.*, 119 F.3d 1411, 1417 (9th Cir. 1997); *Mt. Hawley Ins. Co. v. Lopez*, 215 Cal. App. 4th 1385, 1390 (2013). Furthermore, *Bank of the West* held that "one may not insure against the risk of being *ordered* to return money or property that has been wrongfully acquired." 2 Cal. 4th at 1266 (emphasis added). That public policy rule may not be applicable where, as here, there was no final adjudication of Northrop's alleged ERISA violations, Northrop made no admissions of guilt, and the DOL asserted multiple theories of recovery besides disgorgement. *See, e.g.*, *U.S. Bank Nat. Ass'n v. Indian Harbor Ins. Co.*, 68 F. Supp. 3d 1044, 1050 (D. Minn. 2014) ("When an underlying action alleging ill-gotten gains and seeking disgorgement of those gains settles before trial, there is no final adjudication in that action determining that the gains were ill-gotten and ordering the return of those gains.").

But even accepting that the DOL Settlement required disgorgement and was, therefore, uninsurable as a matter of California state law, AXIS is the wrong insurer to raise that issue here. National Union and CNA could have raised this defense and preserved it for appeal by denying coverage on state law grounds when Northrop referred the DOL Settlement to them for claim adjustment. These underlying insurers' failure to challenge the DOL Settlement under *Bank of the West* at that time does not entitle AXIS, as the secondary excess insurer, to raise the "uninsurable

disgorgement" issue now in relation to a separate insurance claim that AXIS concedes falls within its scope of coverage.

Thus, our holding that excess insurers generally may not second-guess the payment decisions of underlying insurers applies even in cases where, as here, those prior payments arguably were for loss that is uninsurable as a matter of state public policy.  In such cases, as in all others, the burden is on the excess insurer to show that the underlying insurers' payments were motivated by fraud or bad faith, or that it has a clear contractual right to challenge those payments—as contrary to law or otherwise—in the context of unrelated claims.

IV

We conclude that no reasonable insured in Northrop's position would understand that it might have to justify its underlying insurers' payment decisions as a prerequisite to obtaining excess coverage from AXIS.  In reaching the opposite conclusion, the district court misapplied our unpublished decision in *Shy*, ignored the weight of authority rejecting "improper erosion" as a valid basis for denying coverage, and misconstrued the "covered loss" provision in AXIS's excess policy as a reservation of the right to second-guess other insurers' payments.  Accordingly, we reverse the district court's summary judgment order and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**